Case No. 15-5166, Spectrum Pharmaceuticals, Inc. appellate v. Sylvia Matthews Burwell in her official capacity as Secretary, United States Department of Health and Human Services, et al. Ms. Ellsworth for the appellate, Mr. O'Connell for Federal Appellees, and Mr. Farquaad for Appellees-Sandoz, Inc. Good morning. Good morning, Your Honors. Before I begin, I would like to make clear on the record that all of the parties to this case agree that anything that's in the briefing and administrative record in this case can be discussed on the public record. I just wanted to be clear on that. Your Honors, I'm Jessica Ellsworth on behalf of Spectrum Pharmaceuticals. With me at council table are Susan Cook and Eugene Sokoloff. In the audience is Avi Oler, who is the Vice President of Operations and Chief of Staff to the CEO at Spectrum Pharmaceuticals. The administrative record before you in this case shows that FDA clearly understood that 175 and 250 milligram single-use vials of levolucoborin support a specific use of the drug, and that use is colorectal cancer treatment, which often requires doses of 150 milligrams or more. As FDA told Spectrum at JA65 and tells the court at page 29 of their brief, the other use of levolucoborin, which is for methotrexate rescue, requires no more than a 50 milligram vial, because the standard dose for that use is only 7.5 milligrams. But aren't there some doses for that indication that can exceed 7.5? There is one dose for a fairly rare use of the drug that is mentioned on the label that does require 75 milligrams to be administered, and FDA pointed that out in the citizen petition. Even 75 milligrams, though, Your Honor, is significantly less than 175 or 250. The question for the court is whether... But it is more than 50. It is more than 50. That's correct, Your Honor. The question for the court, however, is whether FDA was permitted to approve an application for a generic levolucoborin product that is objectively intended for the orphan-protected indication, which is colorectal cancer treatment. But they don't accept that phrasing of the question, I think. They don't. They don't accept the premise, the factual premise behind that question, because they say it's indicated even at the other doses. So I want to clarify about who the they is in your sentence. Sandoz, in its brief, says at page 32 that it doesn't think its drug is intended for any indication, which, of course, every drug has to be intended for a specific indication. Otherwise, the misbranding statute and all of the requirements to have adequate instructions for intended uses would make no sense. FDA, for its part, I think, at page 29, where it says it acknowledges again that the methotrexate indications do not require anything larger than a 50-milligram dose, a 50-milligram vial, is inconsistent with its decision to approve the larger vial sizes. The answer... But that doesn't prove the flip side of that, that the larger vial sizes wouldn't be appropriate, safe, effective for the other indication. Your Honor, I think if you look at that statement in combination with everything else in the administrative record, which includes FDA's medical review at page 697 of the administrative record, where the medical review team at FDA said that the larger vial sizes were to support the colorectal cancer use, where the smaller 50-milligram vial size was for the methotrexate indication. If you look at the Division of Medication, Error Prevention, and Analysis at pages 703 and 704, that's the division of FDA that is charged with looking at the labeling. The report that they issued said, again, that the larger vial strengths were to support colorectal cancer, and in fact they proposed amendments to the labeling to clarify how it should be used in colorectal cancer treatment. Again, Spectrum's application itself at JA-725 makes the same point. It lists the proposed indication for the larger vial strength to be colorectal cancer use. So we have a statute here that's supposed to direct the FDA. What's your best argument that the text is ambiguous? In other words, what's wrong with the Fourth Circuit decision in your view? Sure. So the text of the statute prohibits FDA from approving an application for such drug, for such disease or condition. So the question really is, what is an application? How does FDA determine what an application is really for? And unlike the Fourth Circuit case, here the application itself contained an inherent mismatch. Sandoz and FDA would like you to focus solely on the use listed on the proposed labeling they submitted. But, of course, FDA does not review an application based solely on the proposed labeling. It has to look at what that labeling will be attached to. And here that labeling is proposed by Sandoz to be attached only to these large strength vials. Those large strength vials, of course, are the ones that Spectrum and FDA have recognized support colorectal cancer treatment. It's, in fact, when Sandoz submitted its application, what it initially applied for before it realized there was an orphan drug exclusivity problem with getting that approval. So unlike the Fourth Circuit, in the Sigma Tau case, which of course is a case from a different circuit and thus not binding, the question that was presented to the court was when there was a disconnect between a proposed label and external marketing data, insurance reimbursement policy. But the language of the statute, for such drug, for such disease or condition, the Fourth Circuit thought that that latter phrase was important, for such disease or condition. It did. What's ambiguous about that? It thought that was important in clarifying that the exclusivity that is granted by the statute is a disease-specific exclusivity and not a drug-specific exclusivity. And it says such disease. Which disease is it referring to? It's referring to the disease for which the generic applicant is seeking approval in their application. And the application, again, here is where the confusion comes in. Because if they had submitted this application for methotrexate rescue and they had proposed to put that label on a 50-milligram vial, we wouldn't be here today. We wouldn't have any objection to that because it is a plausible intended use of a 50-milligram vial for methotrexate rescue. It is not a plausible intended use of methotrexate rescue to use these large vial sizes. But FDA disagrees with that. That's why this ultimately boils down in some respects to a factual question of whether what you just said is so correct that it would be unreasonable for FDA to conclude otherwise. They disagree with us in this litigation. But the statements that are in the administrative record, the statements that they made when they reviewed the proposed larger vial sizes, the statements that they made to us at a meeting in 2009. Right. But lots of statements are made during the course of any process. But you come to a final conclusion that may be different from statements made in the course of the process. And their final conclusion was inconsistent with what you just said, that the larger vial sizes were still appropriate, safe, effective. And I think it's your burden to say that they are unreasonable in concluding as much. And part of your argument is, well, they said different things before. Put that aside. What else would show that they're unreasonable in concluding what they concluded? So I think there are a number of things that answer Your Honor's question. One of them is that we think the language of the statute focuses on the application as a whole. There is no indication in this statute that Congress intended to endorse what are effectively sham labels, where the proposed labeling is inconsistent. I'm sorry to interrupt. The essentially sham label, you've got a lot packed in there. They would say it's not a sham label. I think the agency then would need to show that they engaged in reasoned decision making to show why a 7.5 milligram dose should be placed into a 250 milligram single-use vial so that 97% of the vial is going to be discarded. So what kind of test? What I'm worried about, and you make compelling arguments on all of that, but what I'm worried about is trying to set forth a test that would apply in the future to, as you say, essentially sham. How do we articulate that in your view? The orphan drug exclusivity is intended to protect specific indications, specific uses of a drug. That was the core holding in Sigma Tau, and we don't disagree with that. When a specific use, though, has a specific formulation that is really objectively intended only for that use and only makes sense to be used for that indication, then the orphan drug exclusivity protects that formulation as well. So what I got from you there is objectively intended and only makes sense. I think that's right. Those are tough standards for us to apply. I understand how you would apply them here. Well, I don't think they're that tough in a sense. FDA has specifically said that a generic drug is considered the same drug when it is intended for the same use. So FDA itself, outside of this case, has already taken upon itself, when it interpreted and promulgated regulations to implement the Orphan Drug Act, the same analysis that we're saying it should have performed in this case. I guess what I'm getting at is when they say that a drug meets that standard, how are we to assess whether FDA is wrong on that? That's the hard thing. One thing that's interesting, Your Honor, I would suggest if you read the FDA brief and you read Sandoz's brief, there is no statement in that brief in which FDA says, we believe that this 175 and 250 milligram vial are intended for methotrexate rescue. They don't say that. In fact, it would be very difficult for them to say that given everything else they said at other points in the administrative record. They go on to say they think it's safe and effective. And on that point, what they're really saying is you could withdraw 7.5 milligrams, and that 7.5 milligrams could be used just as 7.5 milligrams could be withdrawn from a smaller vial. What if it's intended for both and it's primarily intended for the one that it can't be intended for but it's still secondarily intended for one that is permissible? How are we supposed to parse that? That is, I think, the situation that was the case in Sigma Tau. There there was a plausibly intended use that was on the label, and the Pioneer Company was arguing there was actually, if you looked outside of FDA's record, there was other material that showed there was another intended use. In our case, you don't get past that threshold question because the labeling is simply not plausibly intended to be applied in the methotrexate rescue use. And that's really our point. This is a case where the agency is asking the court to allow it to indulge in this willful blindness so that it doesn't need to look at material in its own files that suggest that there is an inconsistency. That mismatch between the labeled use and the product on which it is placed makes this case different from the other ones. The colorectal cancer indication also explains FDA's lack of concern with the overfill that would be in this drug product. FDA has guidance documents that direct parties as to its view on how much extra drug there should be, and FDA brushes that guidance document aside here. The reason it's easy for them to brush it aside is because if this is used for colorectal cancer, there won't be... Aren't you asking us to adopt a foreseeability standard here? And isn't that going to be hard to implement? When right now there's an enforcement scheme where if someone has misrepresented, FDA can come after them afterwards. But when we're at the front end of it, it seems to me you're asking us to do something that is very difficult, whereas... We're not asking for a foreseeable use test. And again, that is what makes this case quite different from Sigma Tau. A foreseeable use test would depend on things that FDA can't actually analyze in a pre-approval context, like the marketing data that was at issue in Sigma Tau, like how insurance companies will reimburse this drug. The things that we are pointing to and saying that FDA can't choose to disregard are things that FDA already knows, that are already part of the review process FDA has to undertake in order to approve the application for Sandoz's drug. And the application is what is the focus of the statute. The intended use comes in through 316.3b14 in FDA's interpretation of what that exclusivity covers. And when you put those together, FDA simply didn't do an adequate job of explaining why it was not arbitrary and capricious to approve this drug in the very large vial size for an indication that requires a very small use. I might just note one thing. Sandoz has expressed some concern that this case presents an evergreening concern, which this court faced a little bit in the BMS case, which was a challenge to the labeling carve-out regulation. And we want to be clear that there is no evergreening concern present here, because of course there is a 50-milligram vial that is appropriate for the methotrexate indication, intended for the methotrexate indication, likely also intended for colorectal cancer, but at least plausibly intended for one indication that would be on its label. And so this is not an attempt, as in BMS, of a pioneer company to block competition. This is an attempt to ensure that any competition that FDA authorizes to come on the market is lawful competition. If I can reserve the remainder of my time for rebuttal. Good morning. Good morning, Your Honors. Chris O'Connell from the Department of Justice with me at council table, Mr. Shoshana Hutchinson from the FDA, and Doug Farquhar on behalf of the intervenor defendant, Sandoz. Let me start by saying this. As the FDA's website proudly states, the FDA is responsible for protecting public health by assuring the safety, efficacy, and security of, among other things, human drugs. Conceptually, FDA's efforts to protect the public from unsafe drug products can be broken into two distinct regulatory phases, as Judge Griffiths just recognized a few minutes ago. The first phase is FDA's pre-marker review process, during which the FDA has the opportunity to be proactive by carefully assessing whether proposed new drugs and indications are safe and effective, not reasonably sized, for the public by evaluating, among other things, scientific data, studies, preclinical and clinical data, and things of that sort. The second phase, which commences after a drug is approved for market, is FDA's post-market regulatory compliance and surveillance activities. Spectrum, in this case, seeks to conflate the two phases and essentially asks this court to charge the FDA with conducting a prospective prognostication of potential uses of drugs which are submitted for approval. This is something that finds no support. And I agree with you. That would be wrong. But I don't think that's what your opponent's saying happened here. It didn't have to engage in prognostication, right? Have strong evidence of intended use. I think the record here reflects that at times the higher bile sizes were linked to the colorectal indication, but the record also reflects that the higher bile sizes were completely appropriate for treatment of the methotrexate indications for which they were proposed by Sandoz. The FDA carefully analyzed safety concerns and other issues brought up by Spectrum in its citizen petition, dispensed of these issues in a thorough, comprehensive response, and made a decision as it's charged under the statute that the proposed higher bile size indications of generic levolucavorin were safe and effective for the treatment of methotrexate indications. But aren't we supposed to look at the real world? In the real world, we all know what's happening or will happen. At the premarket phase, the FDA's regulatory charge is just to evaluate the safety and efficacy of a proposed drug, not to engage in market analysis. We all know, let's hypothesize, intended for use for something it can't be because of the exclusivity. And so it's a sham to suggest that it's being marketed for another or being approved for another use. Yes, technically that bile size can be for the other indication, but we all know that it's going to be prescribed for the other indication as to which they have exclusivity. What are we supposed to do with that in a case like that? It's not the FDA's burden under its governing statute here to make this sort of, what you term the real world investigation of proposed uses. I would further state that this is not the case here. We don't have a case where it was clear and unambiguous that the proposed drug was only intended to be used for off-label indications. If it were clear and unambiguous? We might have a case of misbranding if it was a complete sham. And in any event, the post-market surveillance activity by the FDA could be, there could be enforcement action taken if the FDA determines that's the case. I think these are- That's only if there's marketing, right? I think, I mean- That doesn't get to the doctors, right? The, correct, the post-market or the- In other words, correct me if I'm wrong, doctors are allowed to prescribe the higher vial size for the use as to which they have exclusivity. That's correct. And the FDA wants to be careful not to infringe upon that. It's well established that the FDA does not regulate the practice of medicine and the prescription of off-label drugs- But that really defeats their exclusivity right, at least in practice. It's- The value, it defeats the value of their exclusivity right. I think it's impossible to say at this point, because we can't speculate as to what doctors might prescribe going forward in the future. But Congress has made a decision that the FDA is not to regulate the practice of medicine. And if Spectrum is unhappy with that, I think that they're seeking a legislative solution, not a judicial one. But what facts did the FDA rely upon to say that this higher vial size was appropriate for Spectrum when it only approved a 50 milligram vial size for- I'm sorry, for Sandoz when it only approved a 50 milligram vial size for Spectrum? Among other things, the FDA's response noted that there are at least two indications which go beyond 50 milligrams. There's one I believe that's a 75 milligram indication and another which ranges from 85 to 90 milligrams. In addition- That's far short of the 175 to 225. But larger than the 50 milligram size. In addition, the FDA does not- Once it determined that the larger vial sizes were safe and effective for this indication, it doesn't necessarily go beyond that to determine the ideal vial size that should be manufactured. They don't get into business manufacturing processes and the like. Is it the FDA's view that the statute is unambiguous here, or is it ambiguous and you provided a reasonable interpretation? Which is it? The FDA's view is that the statute is unambiguous. Unambiguous. And the FDA's view is on all fours with the decision of the Sigma Tau versus Schwartz Court in the Fourth Circuit, which similarly found the statute was unambiguous. And you said if the statute is ambiguous, the FDA's interpretation to allow carve-outs is entitled to deference in any event. I'm sorry. I should have said it up front. I wanted to reserve five minutes for Sandoz's counseling. Any other questions, Your Honor? Thank you. Thank you, and good morning, Judges Kavanaugh, Griffith, and Wilkins. My name is Doug Farquhar. May it please the Court, I represent Sandoz. I want to start out by addressing a little bit differently the question that Judge Wilkins asked about what facts do we rely upon or did FDA rely upon in determining that the 175-250 size vials are appropriate and safe and effective for the methotrexate indications. And the primary thing that FDA relied upon is the fact that they had already approved those vials for spectrum, for the methotrexate indications. Before the colorectal indication was even approved, FDA had already approved those vial sizes for the methotrexate indications. And when you're going to look at objective intent, which is the standard that Ms. Ellsworth is suggesting, if you look at the objective intent of what was intended, the proposed labeling that spectrum submitted for the drug included the methotrexate indications on the 175-250. As we pointed out in our brief, when FDA was finalizing the draft labeling, they sent the labeling that included the methotrexate indications to spectrum, and spectrum did not respond with any objections. Wait a minute, you're not supposed to include the methotrexate indications. So even if you adopt the objective intent standard that spectrum is suggesting, if you look at this record and you see what FDA did and you see what spectrum did, the 175-250 milligram size was approved, was submitted, for the methotrexate indications as well as the colorectal indications. The other thing that I wanted to address to Judge Kavanaugh's question about don't we need to be concerned about the real world, what's going to happen in the real world, that's not what Congress intended. The plain language of the statute says it cannot be approved for such drug, for such use, or such disease or condition, which FDA then translated in its regulation to for such use or indication, basically the same language. And Ms. Ellsworth's commentary about 316.36, I'm sorry, 316.3B14 in the definition, the intended use is in that definition, but it's the definition of what is the same drug. It's not the definition of what is the use or condition or disease or indication. It's the same drug. There's no question. This is the same drug. Our drug is the same drug as their drug. But what Congress says is you cannot approve the same use, disease, indication, condition for the second drug. And that's the exclusivity that Spectrum has gotten and has received and has not been violated. And for the same reason, because that restriction has not been excluded or exempted or waived, there was no need for FDA to give notice and opportunity for comment to Spectrum before they made the decision to expedite our review of our application. The other thing I wanted to point out is there is an additional difference between the 50-milligram vial and the 175-milligram vial, and besides just the size of the vial. As the record makes clear, the 175-250 vial is a ready-to-use vial. In other words, there's no mixing that's required by the clinic in order to administer the drug. The 50-milligram, on the other hand, is a lyophilized powder, which does have to be reconstituted. So it could well be that the reason that the market is interested in the larger size vial is not because of the size of the vial, but because of the convenience of being able to administer a ready-to-use drug. And that would support people wanting to use the larger size vial for the methotrexate indication, as well as the fact that the 50-milligram, under some circumstances, may be too small. Does your reading of the statute allow for the FDA ever to consider the intended use? Not under the Orphan Drug Act. As Your Honor found in the U.S. Against Regenerative Science case, intended use is important for enforcement actions. But, of course, FDA has the ability to bring enforcement actions, not private parties. They don't have a cause of action to enforce the Food, Drug, and Cosmetic Act. And, in fact, if you look at the cases that were cited by Spectrum in support of 201.128, that's the regulation that talks about intended use. They are all enforcement cases where FDA invoked that against the private party. Unless the Court has further questions? Thank you very much. Just a few points, Your Honors, in rebuttal. Judge Kavanaugh, you asked about the real world, and we think that what is required under this statute is that FDA has to consider the real world as FDA knows that it exists. So while FDA isn't required to do extra research into what foreseeable uses might be out there, what it can't do is put its head in the sand and ignore things that are in its own records. Here in particular, among other things, there was a drug shortage that was affecting treatment for colorectal cancer, and FDA was very concerned with remedying that shortage. That's why it improperly expedited review of Sandoz's product. It's why FDA here could ignore the overfill issue. The overfill guidance from the agency says vial fill should match the labeled dosing information. FDA could ignore that here because, again, FDA knew that the use this product was going to be put to was colorectal cancer indication. Second point is that it's always FDA's burden to offer reasoned decision-making that accounts for all of the evidence in the record. That's what they have not done here. That's where they fell short. In response to Mr. Farquhar's point about the proposed labeling that Spectrum submitted for the larger vial sizes, at the time that supplemental NDA was submitted, the only approved indication was the methotrexate rescue indication. So Spectrum included that as well as making clear that the labeling was based on the then-pending colorectal cancer supplemental NDA. That doesn't show any intent by Spectrum to approve the drug for the methotrexate indication. And lastly, I'd like to reiterate that all statutes must be read in the context of the broader statutory scheme. Here, 360cc is part of the FDCA, and the FDCA is premised on the notion that when manufacturers come to FDA and seek approval for a product, that approval that they're seeking is for the use they intend to put the product to. When that is not met, what you have is a label that is a mismatch for a product, and that's where there's simply no way that Congress could have intended unambiguously for FDA to approve labels that are not reflective of an intended use of a product. Thank you very much, Your Honors. Thank you all very much. The case is submitted.
judges: Griffith, Kavanaugh, Wilkins